THE. VERMILION COUNTY CHILDREN'S HOME *et al.*

*v.*

JEMIMA VARNER *et al.*

*Opinion filed October 24, 1901—Rehearing denied December 5, 1901.*

1. LACHES—*equity aids only the vigilant.* If a party has slept upon his rights and acquiesced in what has been done, equity will not lend its aid in enforcing his demand.

2. SAME—*when the defense of laches should be sustained.* Laches is a good defense to a bill by part of the heirs of a grantor to set aside his deed for non-delivery, where the deed was made in consideration of the services of the grantees in taking care of the grantor during old age, which services were faithfully performed, and where the complainants permitted the grantees to remain in undisturbed possession in the belief that their title was good during the administration of the grantor's estate, lying by without excuse until any claim of the grantees for services was barred.

APPEAL from the Circuit Court of Vermilion county; the Hon. F. BOOKWALTER, Judge, presiding.

KIMBROUGH & MEEKS, and WINTER & REARICK, for appellants.

ADAMS & BLACKBURN, H. M. STEELY, and O. M. JONES, for appellees.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

On June 23, 1888, James Waters made and acknowledged his warranty deed of eighty acres of land in Vermilion county to Louis Booth and Phebe Booth, his wife,

The deed contained a provision that it should be the property and subject to the order of the grantor for and during his natural life, and that it should be held in trust by a third and disinterested party to be designated by said grantor, for and during the term of his natural life and to be delivered thereafter to said grantees for record, provided the grantor had not demanded it and taken possession and destroyed it before his decease.    The draft of the deed was prepared by Pleasant West, a notary public, before whom it was acknowledged, and it was placed in his hands with directions to keep it, and, if not called for within the life of the grantor, to record it.   Waters never called for the deed, and it remained in the custody of West until the death of Waters, on June 5, 1892.   The deed was then put on record June 7, 1892, by West.   When the deed was made the grantees lived on the premises with the grantor, and they continued to live with him until his death, Louis Booth managing the farm and Phebe Booth being the house-keeper.   After the death of Waters the grantees in the deed remained in possession of the land as owners under the deed and paid the taxes.    Louis Booth died intestate in 1893, and Phebe Booth remained in possession and controlled the premises.   On July 16, 1896, Phebe Booth conveyed sixty-six feet off the north side to the Chicago and Eastern Illinois Railroad Company for $312 paid to her.   The railroad company built its road on the same and has ever since been in possession.   On March 30, 1898, Anson Booth, as one of the heirs of Louis Booth, conveyed his interest to William M. Sheets.   James Waters left *no* widow or child or descendant of a child, but left a will disposing of his other property, not including this land.

The appellees, Jemima Varner and Parmelia Ralston, are two of the heirs of James Waters, and on April 15, 1899, they filed their bill in the circuit court of Vermilion county against said Phebe Booth and fifty or sixty other persons alleged to be heirs of James Waters and Louis

Booth, asking to have said deed from James Waters can-
celed as a cloud upon their title as heirs-at-law of James
Waters, and that partition might be made of the prem-
ises.    The bill was amended, adding new defendants in-
terested as heirs, and alleging the execution and recording
of the deeds to the Chicago and Eastern Illinois Railroad
Company and to Sheets.    About that time Phebe Booth
died, leaving a will, by which she gave one-fourth of
her interest in the land to William M. Sheets and three-
fourths to the Vermilion County Children's Home, the
appellants.    A supplemental bill was filed and further
amendments thereto.    The answers of the parties claim-
ing under the deed of Waters denied that it was invalid
and set up *laches* on the part of the complainants.

Appellants filed a cross-bill, alleging that Waters
entered into a contract with Louis and Phebe Booth to
convey to them said lands, reserving a life estate to him-
self, in consideration of personal care and services to
him; that in pursuance of said contract he executed said
conveyance; that they carried out the contract on their
part and performed services of great value to him; that
they went into the open and notorious possession of the
premises, and if the deed was not delivered they acquired
an equitable title; that the deed was executed with all
the formalities of a will, and if not delivered should be
sustained as a testamentary disposition, and that they
were entitled to a specific performance of the contract.
They prayed for a decree quieting the title, or sustaining
the deed as a testamentary disposition, or for a specific
performance of the contract.    The cross-bill was an-
swered and the cause referred to a master in chancery,
who reported that the deed was not delivered; that it
was executed in conformity with the Statute of Wills;
that it was intended to operate as a deed, and that if it
was a will it was revoked by a will subsequently made.
He found that there was a contract, which was fully per-
formed on the part of Louis Booth and Phebe Booth; that

the heirs of Waters never made any claim to the land from his death to the bringing of the suit,—a period of six years, ten months and eight days,—although the grantees were in open and adverse possession, claiming title, and paid taxes, and that the complainants in the cross-bill were entitled to the specific performance of said contract.   The court sustained exceptions to the report, and entered a final decree setting aside the deed as a cloud upon the title of complainants, except as to the sixty-six feet conveyed to the Chicago and Eastern Illinois Railroad Company.

It was proved that the grantor, James Waters, intended to convey the land in question to the grantees, Louis Booth and Phebe Booth, for services for caring for him in his old age, reserving a life estate to himself, and supposed he had done so.   He was ninety-one years old at the time of his death and had been a widower for eight or ten years, with no child or family.   During that time the grantees lived with him and took care of him.   Louis Booth probably paid him rent for the farm land, although it is not very clear what the arrangement was in that respect.   The three constituted the family.   On account of his great age Waters was unable to minister to his own wants, and during the last two or three years he was partially blind and quite deaf.   He could not go anywhere alone in the last years of his life, and if he went out into the yard he could not see to get back into the house.   He required a great deal of care, and chewed a great deal of tobacco, and spit in the fire or anywhere around him.   His personal habits made it hard to take care of him, and this he fully realized.   He had no near relative, and determined to give this land to those who would take care of him.   He expressed to others his intention to give the property to Louis Booth and Phebe Booth to take care of him for his lifetime.   He said that they were taking care of him, and that they had been very good to him and that he intended to give them the home place for

their care. When the deed was made he sent for the notary and instructed him to draw the deed for the land to Louis and Phebe Booth, stating that they had been kind to him and that he wished to be kind to them. He then destroyed a former will which he had made a few months before, by which he had disposed of all his property, and, according to the recollection of the notary, had given this home place to Louis and Phebe Booth. He afterwards stated that he had fixed it so that they would get the home place. The grantees in the deed continued to care for him to his entire satisfaction for the remaining four years of his life. On May 30, 1892, shortly before his death, he made another will, by which he disposed of another eighty acres but made no disposition of this land. At that time he told a witness to the will that he wanted him to tell the notary who drew the will about the land and how he wanted it fixed. He said that he had deeded this land to Louis Booth and Phebe Booth and it would go by the deed, and he wanted the lower eighty, or the timber eighty, to go by his will. The same notary who prepared the deed drew the second will, and Waters told him that he had disposed of this eighty to Louis Booth and Phebe Booth. He said he wanted to give thirty acres of the other eighty to John McMahan and fifty acres to his sister Betsy by the will, and that was done.

The proof is clear that James Waters attempted to convey this land to Louis Booth and Phebe Booth for a valuable consideration, and that the grantees performed the valuable services which formed the consideration with fidelity. The bill as originally filed recognized the contract and the valuable nature of the consideration for the deed, by alleging that complainants were informed that the surviving grantee, Phebe Booth, had a valid claim against the estate of James Waters for services rendered, which they recognized as a claim against the land by their prayer that it should be adjudicated and

allowed to her. This statement is omitted from the amended bill afterward filed. Waters recited in the deed that it was made for and in consideration of the sum of five dollars, "together with the more valuable kind treatment had and received, together with the good intent and interest manifested in and for his personal comforts and domestic affairs in general, had and received by him of and from said grantees, and in consideration of his kindly feelings consequent thereto, and in consideration of his long felt desire to secure unto said grantees a home or place of residence." He and the notary doubtless supposed that the plan adopted was a proper and legal method of executing his intention, and the deed was made as stated, with the provision that he might re-call it. If the deed was not in fact delivered it could not be operative as a deed; but notwithstanding the grantor, when the deed was made, manifested an intention to retain control of it, he might, of course, change that intention at any time and make an absolute delivery of the deed. He never re-called the deed, but was satisfied with his care and treatment by the grantees, and his subsequent statements that he had deeded the land to them, and his statement shortly before his death that the land was to go by that deed and that he did not want to make any disposition of it by his will since it was already disposed of, tend to show an understanding and intention on his part that the deed had become absolute in the hands of the custodian.

When the issue was made and the cause heard the grantees in the deed were dead, and one of them had died five or six years before the bill was filed. A reading of the testimony shows how difficult it is to ascertain the truth with certainty after the lapse of such time and when those who knew the facts are dead. The notary who testified had scarcely any recollection of the circumstances or directions with reference to the delivery of the deed, which had practically faded from his memory. The

parties who were interested, and who might, perhaps, have produced witnesses to clearly establish the contract and that the deed became absolute, were dead. One of the witnesses to the deed, and who was present at its execution, was dead. The evidence, however, shows that the claim of the complainants is not one which appeals strongly to the conscience of a court of equity. If it can be enforced, it is to be done against the intention of all the parties to the transaction and not in the interest of natural justice. Under the circumstances, without considering or regarding any other evidence, we think the defense of *laches* requires the reversal of the decree. The grantees and their grantees were constantly in possession, claiming ownership of the land and making conveyances of it. Complainants suffered them to repose in the belief that their title was valid while the estate of Waters was administered. They laid by without any excuse until any claim against said estate for services rendered was barred by the five years statute of limitations. Equity makes *laches* under such conditions a bar to relief, regardless of any statute of limitations. No explanation whatever for the unreasonable delay was offered, either in the bill or the evidence. Complainants are neither minors nor non-residents and under no disability. Where a party has slept upon his rights and acquiesced in what has been done, equity will not afford its aid in enforcing his demand. We think this an appropriate case to apply the rule that equity aids only the vigilant, and, ignoring all other questions, we think the complainants' bill should have been dismissed for want of equity.

The decree of the circuit court is reversed and the cause is remanded to that court, with directions to dismiss the bill.                *Reversed and remanded.*